**METROPOLITAN HOUSING DEVELOPMENT CORPORATION, an Illinois not-for-profit corporation, et al., Plaintiffs,**

v.

**The VILLAGE OF ARLINGTON HEIGHTS, a municipal corporation, et al., Defendants,**

and

**Northwest Opportunity Center, Inc., an Illinois not-for-profit corporation, et al., Plaintiffs-Intervenors.**

No. 72 C 1453.

United States District Court,
N. D. Illinois.

Feb. 22, 1974.

F. Willis Caruso, Chicago, Ill., for plaintiffs.

Jack M. Siegel, Chicago, Ill., for defendants.

## DECISION

McMILLEN, District Judge.

This case came on for trial on the merits, and the court has heard the evidence and considered the exhibits offered and received. The court has also considered the pre-trial stipulation and post-trial briefs filed by the parties and is fully advised in the premises. We find and conclude that judgment should be entered in behalf of all defendants, for the reasons stated hereinafter pursuant to F.R.C.P. 52(a).

Plaintiffs consist of a not-for-profit corporation created to develop housing for low and moderate income tenants and three individuals who seek to represent a class of such persons. The plaintiff corporation owns an option to purchase 15 acres of vacant land from its present owner, the Clerics of St. Viator. A second not-for-profit corporation intervened as a co-plaintiff but its presence is irrelevant to this Decision.

Plaintiffs contend that their civil rights have been violated by virtue of a decision of the trustees of the Village of Arlington Heights, Illinois, not to rezone the land in question for multiple family housing. Specifically, they allege in Count I that defendants have perpetuated racial segregation by declining to rezone and, in Count II, that the plaintiff corporation has been denied the right to use its property in a reasonable manner. This allegedly constitutes a violation of the plaintiffs' civil rights under Sec. 1981, 1982 or 1983 of the Civil Rights Act and the Fair Housing Act of 1968. 42 U.S.C. §§ 1981, 1982 and 1983, and § 3601 et seq. respectively. No specific section of the Fair Housing Act is referred to in the pleadings and none seem applicable to the facts of this case.

Plaintiffs seek in the case at bar to extend the penumbra of the Fourteenth Amendment considerably beyond its present outer limits. They do not represent persons seeking to eliminate discrimination in existing facilities, whether residential or some other type. They do not represent a landowner seeking to use his property for some purpose within the existing zoning ordinances. Rather, the corporate plaintiff seeks to require defendants to rezone a vacant tract of land so that it can build a Federally subsidized low rent project on it, for occupancy by the class which the individual plaintiffs seek to represent. The justification proposed for using judicial processes to achieve rezoning is to supply housing for low income tenants who desire to work and live in the area. No cases have been cited by plaintiffs to support this extension of the Fourteenth Amendment into area-wide integration, but they rely primarily on familiar cases involving education, employment or public facilities. They also rely on Kennedy Park Homes Ass'n et al. v. City of Lackawanna, N. Y. et al., 436 F.2d 108 (2nd Cir. 1970), cert. den. 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546, where defendants acquired a tract for discriminatory reasons and were ordered to restore its prior status. We do not find that these authorities support the plaintiffs' objectives in the case at bar, notwithstanding their laudatory motives.

The litigability of this and other legal issues have been decided by our predecessor judge on appropriate motions, and we find no need to reexamine his conclusions. We assume for the purposes of this Decision that the plaintiff corporation has sufficient interest in this property to give it standing to sue. The essence of the alleged offense is the refusal of the Village to accommodate a landowner's desire to use his property as he sees fit, although the plaintiff corporation acquires no different status than any other corporation merely because it has been created for the purpose of developing housing for low income tenants.

The individual plaintiffs, in our opinion, do not represent a definable or manageable class. They purport to represent "low and moderate income minor-

ity-group members who work or desire to work in Arlington Heights but cannot find decent housing in Arlington Heights at rents they can afford". Obviously the members of this class would be too heterogeneous and varied to ever be brought into court, and their claims would raise a multitude of different factual questions. Nevertheless, one individual plaintiff, Electeria Muldonado, a Mexican-American, did appear and testify, and her presence along with the corporate plaintiff suffices to raise a case or controversy concerning the validity of the defendants' acts. Since we intend to decide this issue on its merits, we see no purpose to be served by debating the question of standing any further.

Defendants are accused of failing and refusing to rezone the 15 acre tract from an R–3 single-family detached residence use to an R–5 multi-family attached residence use (such as apartments). Plaintiffs took the necessary administrative steps to obtain rezoning and made various changes in its proposal in an attempt to satisfy various objections which were raised by the Village's Plan Commission. Ultimately, however, the Plan Commission recommended against rezoning the property and the defendant trustees voted 6 to 1 against the proposition on September 28, 1971. Plaintiffs allege that this vote was motivated at least in part by racial discrimination against certain minority groups who work in or around Arlington Heights.

There is no direct evidence by which to determine the motives or mental processes of the trustees, and plaintiffs depend on circumstantial evidence. The crucial fact question, however, is whether the result of the defendant trustees' action caused racial discrimination. As has often been stated, (e. g. Gautreaux et al. v. Romney, 448 F.2d 731 at 738 (7th Cir. 1971)), motives are irrelevant if the effect is illegal. If it is, we would reach the legal question of whether defendants can be required to change the zoning of the property.

Plaintiffs have failed to carry their burden of proving discrimination by defendants against racial minorities as distinguished from the under-privileged generally. They have proved that housing for low-earners is scarce in Arlington Heights and the surrounding suburban area, but this affects the entire group, not merely blacks or Mexican-Americans. The Fourteenth Amendment and the Civil Rights Act prohibit discrimination against blacks and certain other minorities but does not afford rights to poor people as such. Furthermore, some blacks and other minorities do live in Arlington Heights, and an 11% vacancy rate exists for rental property in the Village. What is lacking is low rent property, but even this is available at the corporate plaintiff's project just north of Arlington Heights and nearer to the principal employer of minorities than is the property on which the plaintiff now seeks to build new housing.

There are many reasons why members of minority groups would not necessarily move into the defendant village, besides alleged discriminatory violations. This is illustrated by one of the two blacks who testified as a plaintiff. After his employer had moved its plant to Arlington Heights, he voluntarily moved farther away and thereby increased his commuting time from 35 minutes to one hour. His motive was to invest in a two-flat, not to live in a suburb near his employment.

■ There can be no question but that plaintiffs and the group which they seek to represent would be benefited by this proposal. It is not denied by the defendants that citizens with low incomes would find better living conditions in the project and might be able to save expenses by living there. However, plaintiffs do not contend that their jobs are in jeopardy for want of a convenient and economical place to live, and their employers do not contend that they are deprived of an adequate supply of labor in the low-wage brackets. In fact, the employers are not parties hereto and no

evidence was presented on their posture in this controversy. The legal issue on this point, therefore, is whether low-income minorities have a constitutional right to live in an area where they work or desire to seek work. Even more broadly, do low-income workers have a constitutional right to low-rental housing either where they work or elsewhere? We know of no such rule of law.

Plaintiffs did prove that the "highest and best use" of this property from an economic standpoint is for multi-family dwellings. High rise apartments such as have been built elsewhere on R–5 property in Arlington Heights are even more economically desirable for the landowner than the low-income project proposed by the plaintiff corporation. However, the issue in this case is whether defendants can be required to zone any real estate for multi-family dwelling if they have good faith reasons for not doing so.

Defendants' evidence shows that the property in question was originally zoned for single-family detached residences and has been continuously so zoned up to the present time. It has always been vacant and is completely surrounded by single family residences, with the exception of a parochial school on the north and the religious order's three-story dormitory on the west, a pre-existing non-conforming use. The village's zoning plan contemplates the systematic development of land for particular uses with buffer zones or devices between different use zones. In the case at bar, the plaintiffs' project would not constitute a buffer between zones, because no other zone except R–3 exists in the area.

■ On the other hand, the evidence shows that a multi-family development would seriously damage the value of the surrounding single-family homes and that its presence in the area is strongly opposed by large groups of citizens of the village. Their motive may well be opposition to minority or low-income groups, at least in part, but the circumstantial evidence does not warrant the conclusion that this motivated the defendants. They have zoned 60 tracts for the R–5 use and some of it is still vacant and available to plaintiff—as no doubt are some existing multi-family buildings. The weight of the evidence proves that the defendants were motivated with respect to the property in question by a legitimate desire to protect property values and the integrity of the Village's zoning plan. This is not an arbitrary or capricious act in derogation of the plaintiffs' 14th Amendment rights.

Lest plaintiffs conclude that they are faced with an insurmountable problem of proof, they are referred to a recent decision by this court in the case of Cousins et al. v. City Council of the City of Chicago et al., D.C., 361 F.Supp. 530. There the plaintiffs succeeded in proving that the defendant City discriminated against a black minority when it established the boundaries of the 7th Ward, as evidenced by certain acts and statements of an alderman, changes wrought in a pre-existing ward map, and certain circumstantial evidence. This decision, incidentally, is on appeal.

Another possible deficiency with plaintiffs' case is that the corporation lacks the present capacity to carry out its proposed project. It was to be financed pursuant to Sec. 236 of the National Housing Act of 1968. However, according to the evidence, all funds under this statute have been sequestered, and no projects are now being financed. The plaintiff's option with the owners would terminate if a Sec. 236 project could not be built on the property, but the present Federal funding situation would at least cause this Court to withhold any present relief to the plaintiffs. The sequestration of funds may continue permanently or may change, but once the land is zoned R–5, the process is well-nigh irreversible, and many varieties of buildings could then be constructed by the legal owners in the midst of the existing single-family residential area.

This leads to the question of whether the legal owner of the property has a

Federal right to require zoning for the highest and best use. Aside from the statutes cited above (p. 209), no Federal rights are relied upon by the plaintiffs, and these statutes do not reach zoning *per se.* This particular issue was not decided on the motion to dismiss the complaint in Sisters of Prov. of St. Mary of Woods v. City of Evanston, 335 F.Supp. 396 (D.C.1971).

Also lurking in the background is what conditions a municipal corporation can legitimately require before property is rezoned. Except for the issue of discrimination raised in Count I and the issue of arbitrary and capricious denial of the corporation to use its own property in a reasonable manner raised in Count II, however, the validity of local zoning procedures have not been contested by the plaintiffs and are properly reserved for the state courts.

It is therefore ordered, adjudged and decreed that judgment is entered on the Complaint and on the Intervening Complaint in favor of the defendants.